UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.  19-CR-022 (ESG) |
| | : | |
| v. | : | |
| | : | |
| ANTHONY GARDEA, | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.  For the reasons set forth herein, the government recommends that the Court sentence the defendant to 48 months incarceration.  The government further recommends that the Court sentence the defendant to 10 years of supervised release with conditions that include that the defendant undergo sex offender treatment (as recommended by the United States Office of Probation), the defendant's computer and internet usage be limited and monitored, and the defendant's direct contact with minors be limited and supervised.

**I.     BACKGROUND**

   **I.   Background of Investigation**

In October 2015, HSI agents in Phoenix, Arizona, began conducting undercover operations on an Internet-based video conferencing application used by persons interested in exchanging child pornography and/or sexually abusing children.  This application is hereinafter referred to as "Application A."[1]  "Application A" is designed for video conferencing on multiple device formats.

---

[1] The actual name of "Application A" is known to law enforcement.  "Application A" remains active and disclosure of the name of the application would potentially alert its users to the fact that law enforcement action is being taken

1

To use this application, a user downloads the application to a computer, mobile phone or other mobile device (*e.g.*, tablet) via direct download from the company's website. Once downloaded and installed, the user is prompted to create an account. "Application A" users can invite others to an online meeting "room," which is an online location associated with a 10-digit number where each user can see and interact with the other users. When a user chooses to enter a specific meeting room, the user enters the 10-digit room number and enters the username that he wants to use on that specific occasion, which does not have to be the same as the account username. "Application A" does not require a certain number of characters for a particular username.

During a meeting, users can show a live image or video of themselves to other users through the webcam feature. Users may also display the contents of their own computer desktops to the other users in the room. The ability to display their own computer desktops allows users to show videos and photos to other users in the room. "Application A" also allows users to send text messages visible to all of the users in the room, or private messages that are similar to instant messages sent between two users. "Application A" permits users to conduct online video conferences for free for a limited number of minutes. Paid subscribers can conduct online video conferences for an unlimited amount of time. Some "Application A" users with a paid account permit their rooms to be accessed without a password such that anyone who knows the room number can enter and leave the room at any time.

"Application A" maintains IP address logs for each meeting room, which includes all of the IP addresses (and related usernames) for each user in a particular room on a specific day and the device that was used by each user. Each user's unique IP address is logged to reflect the time that

---

against users of the application, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the application will be identified herein as "Application A."

particular user entered the room and the time the user exited the room.  Users can enter and exit the room multiple times, thereby creating multiple sessions[2] within the logs of "Application A." In other words, if a room is open and active for one hour, and in that hour, a user enters the room, leaves the room, and then re-enters the room, the "Application A" IP log records would reflect two sessions for that specific user (entry/exit, followed by second entry) in the same room on that date.

## II.     Defendant's "Application A" Criminal Conduct

On January 25, 2016, an HSI agent located in Phoenix, Arizona, acting in an undercover capacity and using a device connected to the Internet, signed into an "Application A" user account and entered an "Application A" meeting room, which was a known child pornography meeting room.  Within that room, the undercover agent confirmed that an "Application A" user was displaying or streaming a video depicting child pornography.  The undercover agent was able to record this child pornography video, and other activity and message(s) in the room, to an undercover device.

Among the videos streamed and displayed by the meeting room leader included a video of a prepubescent male child.  The child's jeans are pulled down to the child's knees, exposing his penis and genitalia as an adult male touches the child's penis.  A subsequent video depicts a pre-pubescent female with long hair. An adult male inserts his erect penis into the female child's mouth.

While recording the activity in the above described "Application A" room, the HSI undercover agent observed an "Application A" user was present in the meeting room with the display name DMV PERV.  This user was subsequently identified as the defendant.   During this UC recording, the defendant can be seen by the group via his web camera.  He is nude and laying

---

[2] As used herein, a session refers to a particular user's time in a specific "Application A" room.

on a bed. He is turned slightly on his right side to face the web camera and is observed using his left hand to masturbate himself.

On February 16, 2016, the same HSI undercover agent, using a device connected to the Internet, signed into an "Application A" user account and entered a different "Application A" meeting room, which was a known child pornography meeting room. Within that room, the undercover agent confirmed that an "Application A" user was displaying or streaming a video depicting child pornography. The undercover agent was able to record this child pornography video, and other activity and messages in the room, to an undercover device.

The video depicts a male toddler with blonde hair lying in a bed wearing a blue shirt. This male toddler is naked from the waist down. The male toddler's penis is clearly visible and appears to be the focus of the video. Also depicted in this video is an adult male. This adult male puts his mouth on the toddler's penis. Further, in this video the adult male inserts or attempts to insert his penis into the toddler's anus.

While recording the activity in the above described "Application A" room, the HSI undercover agent observed the same "Application A" user, DMV PERV (identified as the defendant), was present in the meeting room. During this UC recording, an image of the defendant can be seen by the group via his web camera. He is observed nude from the waist down and laying on his right side. He is facing the camera and using his left hand to masturbate himself.

On or about June 28, 2016, a U.S. Department of Justice Administrative Subpoena was served on Application A for subscriber and login information related to activity in the "Application A" meeting rooms identified above on February 16, 2016 and January 25, 2016. The results revealed that a user of DMV PERV logged in to the pertinent "Application A" meeting rooms from the following IP address: 73.163.34.151. Further, "Application A" provided information stating that the IP address 73.163.34.151 was associated with logging on to "Application A" 15 times and

4

had logged 428 minutes of use on "Application A."

A query of the American Registry for Internet Numbers ("ARIN") online database revealed that the IP address 73.163.34.151 is registered to Comcast. In or about June 2016, a U.S. Department of Justice administrative subpoena was issued to Comcast in regard to the IP address 73.163.34.151. A review of the results obtained from Comcast identified the following account holder and address: [XXX] Lamont Street NW, Washington, D.C. 20010 ("Lamont Street") and account holder W-1.

On or about November 1, 2016, Special Agent (SA) Abruzzese with Homeland Security Investigations (HIS) interviewed the owner of the residence, W-1. W-1 indicated that W-1 lived at the residence with four roommates, which included the defendant. The defendant was the only heavyset Hispanic male residing at the location that matched the individual depicted in both of the Application A sessions.

On November 1, 2016, SA Abruzzese traveled to Lamont Street and encountered the defendant who agreed to be interviewed. During this interview, the defendant stated that he has used Application A and Skype to communicate with other males on the Internet. The defendant confirmed that his computer was for his use only and that there was a password associated with his computer. The defendant consented to the seizure and search of his Dell Inspiron laptop (SN G3FZG22).

On or about November 9, 2016, a federal search and seizure warrant issued by the United States District Court in the District of Columbia was executed at Lamont Street. The warrant authorized the search and seizure of evidence of violations of 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B), which make it a crime to distribute, receive, possess, and access with intent to view child pornography. During the execution of the search warrant, additional electronic devices were located and seized from the residence, including the defendant's Apple iPhone 6s

5

(SN:C76RKH71GRYF).

The defendant again consented to an interview by SA Abruzzese. During this second interview, the defendant stated that on Skype, he used the screen names: DC GUY or DC PIGGY GUY.

### III. Defendant's Receipt of Child Pornography

Based upon information obtained from a simultaneous investigation in Alexandria, Virginia, law enforcement learned of a Skype exchange between Skype user photostud76 and the defendant, who was using the Skype name dcpiggyguy1. This Skype conversation between photostud76 and the defendant took place on February 16, 2016 between 7:47 am and 9:26 am. During the course of this conversation, photostud76 sent the defendant three images depicting child pornography. In response to receiving these images, the defendant expressed his desire to "rape" and "t[ear] to pieces" the infants depicted. The three images received by the defendant over Skype include:

(a) File name b51.jpg: This image depicts an infant that is laying on the floor naked with his diaper pulled off. The infant's penis and anus are the focal point of the image.

(b) File name b39.jpg: This image depicts an infant male with his diaper removed and an adult male is sodomizing the infant with his erect penis.

(c) File name b54.jpg: This image depicts two prepubescent minors, one of which is an infant. Both children are completely naked in the image. The older prepubescent minor is a male and has an erection. The older prepubescent male has his right hand on the infant's private area.

### IV. Forensic Review of Defendant's Electronic Devices

While no depictions of child pornography were located on the defendant's Dell laptop, the forensic review identified numerous other Skype conversations between the defendant and other

6

users on Skype involving the exploitation of children. For example, in these conversations, the defendant often referenced being a "perv" and accessing "pedo vids" on "Application A." The defendant often requested that individuals meet him in various "Application A" rooms known to stream child pornography videos. The defendant indicated in these conversation that he is a "taboo lover" who "like[s] any age, but 3-8 is hot[,] I like watching vids 0-3."

The forensic review of the defendant's cellular phone identified that Skype user photostud76 was one of the defendant's Skype contacts, and the defendant's Skype username connected to his cell phone was dcpigguyy1.

## II.     SENTENCING CALCULATION

### A.     Statutory Penalties

The charge of Access with Intent to View Child Pornography carries a maximum sentence of 20 years of imprisonment pursuant to 18 U.S.C. § 2252(a)(b)(2) if any image involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made, and a period of supervised release – after any period of incarceration – of not less than five years or life pursuant to 18 U.S.C. § 3583(k).

### B.     Guidelines Range

The Presentence Investigation Report ("PSR") sets forth the correct calculation of the defendant's Guidelines range. The Guideline for Count One, Access with Intent to View Child Pornography, is U.S.S.G. § 2G2.2.

The base offense level is 18. PSR ¶ 26. The following Specific Offense Characteristics apply: (a) a two level increase because the material involved minor under 12 years old, (b) a four level increase because the material portrayed infant/toddler, and (c) a two level increase because

7

the offense involved use of a computer.  PSR ¶¶ 27-29.  Accordingly, the base offense level is 26.  PSR ¶ 33.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  PSR ¶ 35.  The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources.  PSR ¶ 36.  As a result, as set forth in the plea agreement, the defendant's total offense level is 23.  PSR ¶ 37.

The defendant has no prior criminal conviction.  PSR ¶ 39.  Accordingly, the defendant has zero criminal history points and is a Criminal History Category I.  PSR ¶ 40.  With a total offense level of 23 and a Criminal History Category of I, the defendant's sentencing range of imprisonment is 46 months to 57 months of imprisonment.  PSR ¶89.

## III.    GOVERNMENT'S RECOMMENDATION

### A.    Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After

8

giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  Id.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

Notably, the United States Sentencing Commission conducted a hearing on the child pornography sentencing guidelines on February 15, 2012.  Department of Justice (DOJ) employees James Fottrell and Steve DeBrota, and former DOJ employee Francey Hakes provided the following testimony regarding how technological advances were exacerbating the threats posed by child pornography offenses:

> In the last ten years, we have seen a sharp increase in the severity and depravity of child pornography offenses, fueled in large part by *swiftly advancing technological changes* which permit offenders to easily store large numbers of images of child sexual abuse, to create safe havens online where they can communicate and bond with other individuals who encourage and promote the sexual exploitation of children, and to utilize sophisticated methods to evade detection by law enforcement.  This increase is reflected in the changes in the content of the images over time, as infants and toddlers are now regularly victimized by child pornography offenders and the victims are forced into more brutal and degrading sexual activity.
>
> Additionally, *the technological changes that continue to make it easier for offenders to commit these crimes* are reflected in the number of defendants prosecuted in federal court for child pornography offenses, which has increased every year for over ten years.

9

> We are also seeing the crime change with respect to the *technical complexity and sophistication of the offenders who exploit the developments in both software and hardware*. Storage capacity on hard drives and external media has exploded at the same time that prices for such equipment have dropped, making it feasible for individuals cheaply to store millions of image and video files. Internet speeds have skyrocketed, allowing users to download a video in a matter of seconds that, just a few years ago, would have taken hours. At the same time, smart phones and the development of faster wireless networks have turned phones into a viable and portable alternative method to distribute and collect child pornography. *New platforms are being constantly developed to allow individuals to chat, network, and share files. Child pornography offenders are early adopters of these platforms, co-opting them to further their criminal purpose and to create virtual communities that exist outside the bounds of normal society and that embrace and promote the sexual exploitation of children*. Finally, offenders are *exploiting the development of new technologies*, such as evidence eliminating software, encryption, and methods to conceal their Internet activities, *to evade detection by law enforcement*. The result of these changes is clear: we are seeing more and more offenders, engaged in more sophisticated criminal conduct, exploiting a larger number of children in a more depraved way.

See https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf (emphasis added).

### B.    Basis for the Government's Recommendation

The government submits that the sentence of 48 months incarceration (4 years) is appropriate and warranted in this case and specifically recommends a period of supervised release of 120 months (10 years) based on the factors in 18 U.S.C. § 3553(a). The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

#### 1.    Nature and Circumstances of the Offense

Consistent with the Justice Department testimony noted above, the defendant's use of technologically-advanced online sites made tracking his activities exponentially more difficult to discover by law enforcement and demonstrates the growing threat posed by such technology in the child exploitation realm. While the defendant was not "involved in taking photographs of children, his conduct had allowed the child pornography enterprise to continue," United States v.

10

Grebenschikov, 288 F. App'x 834, 837 (3d Cir. 2008).  Moreover, the defendant participated in the feeding of a demand for such content; where such demand existed, a supply was manufactured. See Paroline v. United States, 134 S. Ct. 1710, 1741 (2014) (citations omitted) ("By communally browsing and downloading Internet child pornography, offenders like Paroline 'fuel the process' that allows the industry to flourish . . . .  Indeed, one expert describes Internet child pornography networks as "an example of a complex criminal conspiracy . . . ").

  The defendant has shown a specific preference for the most egregious types of child pornography: images and videos of toddlers and infants being sexually victimized and abused.  This is not an individual who seeks out child pornography of minors or children – which would certainly be egregious enough- but here, the defendant's sexual interests target the most vulnerable and innocent members of our community: infants and toddlers.  This is evident by the defendant's actions: (1) the defendant was observed masturbating in "Application A" rooms, one of which was streaming a video of an adult male anally penetrating a toddler, (2) the defendant's chats made it known to others that he was looking for child pornography that depicted infants and toddlers (i.e. "I like watching vids 0-3," "yngst vid u have?"), and (3) the defendant admired and encouraged users to discuss their sexual abuse of children with him.

  It goes without saying that child pornography causes real and lasting harm in our society.  It is not just about images and videos; it is about real children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly sexually abused.  Individuals—like the defendant—who promote child pornography offenses are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos.  As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole.  It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have

a tendency to become sexual abusers as adults.

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10 (1982). The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography . . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." Id. at 759 n.10.

The victim identified in the defendant's offense (known as the 'Vicky series'), as well as her family members, submitted various victim impact statements. These victim impact statements were provided to the Court on April 9, 2019 under seal pursuant to 18 U.S.C. § 3509(d)(2). The victim impact statements share a common theme: the victims must cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse. The victims are revictimized – continuously exploited – by each consumer of child pornography. As the victim in the "Vicky" series explained:

> I live everyday with the horrible knowledge that many people somewhere are watching the most terrifying moments of my life and taking grotesque pleasure in them. I am a victim of the worst kind of exploitation: child porn. Unlike other forms of exploitation, this one is never ending. Everyday, people are trading and sharing videos of me as a little girl being raped in the most sadistic ways. They don't know me, but they have seen every part of me. They are being entertained by my shame and pain.

### 2. History and Characteristics of the Defendant

In most criminal cases, a defendant will appear for sentencing and offer mitigating evidence, asking the Court to consider the defendant's sometimes less obvious, but positive attributes. In child-exploitation related crimes, however, a defendant's good qualities are frequently the easiest to see. Defendants appear to be like any other law-abiding citizen—they work, worship, and have the support of their families. Their crimes against children, and the

reasons they commit them, have been hidden from colleagues, friends, and loved ones. Despite that fact, the perpetrator's private crime is a horrific one, and offenders must be held accountable for the damage they have done.

As described above, the defendant was a frequent participant in various "Application A" meeting rooms that were streaming videos of child pornography. His IP and username logged 428 minutes (over 7 hours) of time in "Application A" rooms, and a review of his chats with other users shows him often reaching out to inquire about child pornography meeting rooms where he can go and "play" and watch "ped vids."[3] The crowdsourcing nature of "Application A" makes this type of offender more dangerous because he has found a group of people who affirm and encourage his distorted thinking, i.e., child sexual abuse is not just tolerated, but encouraged. These online communities not only serve as online 'trading posts' for illicit material, but they also provide social validations, a sense of belonging, and support for his most perverse desires.

### 3. **Punishment, Deterrence, Protection, and Correction**

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses. The defendant's viewing of child pornography harms society at large and specifically, the child victims, and thus warrants a sentence

---

[3] It should be noted that while some of these streaming videos are prior recorded ones, other times there are "live" videos of hands-on abuse.

13

of imprisonment. Moreover, a term of supervised release – with conditions including sex offender assessment and treatment – is important to ensuring that the defendant receives the treatment and support that will ensure he does not commit any additional crimes in the future.

### 4. Available Sentences And Supervised Release Conditions

The defendant should be sentenced to a term of incarceration. The defendant is in Zone D of the Guidelines, and thus a probationary sentence would be a departure from the Guidelines. PSR ¶ 103. According to the PSR, the defendant does not have the ability to pay a fine in this case. PSR ¶ 87.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 10 years. Supervised release is critical because it will subject the defendant to ongoing monitoring and ensure that he does not revert back to his criminal conduct when he finds himself facing a life challenge or obstacle.

The conditions of supervised release should include the following conditions, which are conditions imposed in similar child exploitation cases and conditions:

(1) The defendant must submit to searches of his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, and effects, at any time, with or without a warrant, by law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

(2) The defendant must undergo and comply with sex offender evaluation and treatment. This may include the use of polygraph testing as part of the therapeutic process.

(3) The defendant's use of the Internet, computers, and any other Internet-capable devices will be restricted and monitored.

> (4) The defendant will not have direct contact with minors without the written approval of probation. This also entails both an employment/volunteer restriction and residential restriction, in that the defendant shall not be employed in any capacity, or participate in any volunteer activity, which may cause him to come in direct and/or unsupervised contact with children for more than momentary duration without advanced approval by the United States Probation Office, and the defendant shall have all residences pre-approved by the United States Probation Office. Specifically, the defendant shall not live in a residence where minor children also reside without the permission of the United States Probation Office.

The defendant's crimes stem from his online activities and warrants monitoring of his electronic devices and Internet activities. Moreover, the defendant's long-standing interest in the exploitation of children justifies monitoring his direct contact with any minors and supports the imposition of sex offender evaluation and treatment.

### 5.   Avoiding Unwarranted Sentencing Disparity

One of the statutory factors to consider at sentencing is the need to avoid unwarranted disparity. Indeed, avoiding such uncertainty and disparity was one of the purposes for the creation of the Sentencing Guidelines. Notably, however, the sentences for child pornography offenses vary widely. Similarly situated offenders have been sentenced from 13 months of incarceration to in excess of 100 months of incarceration.

The factors that typically result in courts imposing sentences within or closer to the sentencing guideline range include cases in which there is indicia of a sexual interest in children or "hands on" abuse of children, cases where the defendant has a criminal history, and cases where there are other indicia that the defendant is not likely to be susceptible to rehabilitative efforts. Cases in which courts vary significantly downward from the guidelines tend to include those where

15

the conduct is isolated and unaccompanied by other indicia of a likelihood of "hands on" abuse or other criminal activity, the defendant has no criminal history, the defendant provided significant cooperation, or of his own initiative, engaged in significant efforts and/or rehabilitation in advance of any order by the court to do so.

Here, the government acknowledges that there is no indicia of "hands on" abuse of children, the defendant has no criminal history, and he was cooperative with the government. However, the government has already taken these mitigating factors into account in its plea offer: the defendant pled guilty to a charge that did not require a mandatory minimum sentence, unlike Receipt of Child Pornography, which would have carried a mandatory minimum sentence of 60 months (5 years).

The defendant's communications with other like-minded individuals and his conduct in this case warrants a sentence within the guidelines range, albeit at the low end of the guidelines. The defendant's interest in child pornography was particularly disturbing in the types of images and videos he sought after – to wit, toddler and infant abuse. Accordingly, when weighing the above concerns about the defendant's conduct in this case with the fact that the defendant has no criminal history, was cooperative with the government, and he accepted early responsibility, the government believes that a sentence within the low end of the guideline range is appropriate.

### 6. Restitution

The government has been in communication with the victim's lawyer and defense counsel. At the time of this filing, the victim identified in the "Vicky" series has requested restitution. It is the government's understanding that the parties are in the process of negotiating a restitution amount for this victim. This government will be asking at sentencing that this agreed upon amount be included in any Judgement and Commitment Order by the Court at the time of sentencing. The government acknowledges and is appreciative of the defendant's willingness to cooperate with his restitution obligations without the need for protracted litigation

16

in Court.

## IV.     **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 48 months incarceration, to be followed by 10 years of supervised release, with the recommended conditions of supervision.

        Respectfully submitted,

        JESSIE K. LIU
        UNITED STATES ATTORNEY

        ___/s/_____
        Lindsay Jill Suttenberg, D.C. Bar 978513
        Assistant United States Attorneys
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-7017; Lindsay.Suttenberg@usdoj.gov